**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Brenda Turcotte</u>

     v.

<u>Comcast Cable Communications</u>
<u>Management, LLC</u>

Case No. 17-cv-150-PB
Opinion No. 2019 DNH 024

<u>MEMORANDUM AND ORDER</u>

Brenda Turcotte alleges that Comcast Cable Communications
Management, LLC ("Comcast"), her former employer, violated the
Americans with Disabilities Act ("ADA") and its state-law
analogue by failing to reassign her to a vacant position within
the company as an accommodation for her disability.  Comcast
argues that it is entitled to summary judgment because Turcotte
cannot prove at trial that she was entitled to a reassignment.

## I.  <u>BACKGROUND</u>

Turcotte worked at Comcast from November 2008 until August
2014.  She was hired as a Customer Account Executive to field
inbound telephone calls from Comcast customers.  Her performance
in this job was unsatisfactory.  <u>See</u> Def.'s Ex. B (Doc. No. 15-
3).  Starting in March 2010, Turcotte took an 18-month leave of
absence protected by the Family and Medical Leave Act ("FMLA")
due to work-related panic attacks and bereavement, her mother
having recently died.  Her medical providers furnished

documentation to Comcast to support her entitlement to FMLA leave and her need for an accommodation. See Pl.'s Ex. 1, Attach. B1-B5 (Doc. No. 23-1).

During her leave, Comcast placed Turcotte on an extended internal job search to explore new positions as an accommodation for her disability. In September 2011, she accepted a transfer to the position of Pre-Caller. In this role, she made outbound calls to customers to verify service appointments and do limited troubleshooting. See Def.'s Ex. H at 27 (Doc. No. 15-9). Turcotte performed satisfactorily in this job. See Pl.'s Ex. 1 ¶ 10 (Doc. No. 21-2).

After about two years, in mid-2013, Comcast automated the Pre-Caller function and all Pre-Callers transitioned to Dispatch positions, tasked with receiving inbound calls from field technicians. See Def.'s Ex. H at 92 (Doc. No. 15-9); Def.'s Ex. J at 160-61 (Doc. No. 15-11). Comcast trained all Pre-Callers, including Turcotte, on how to perform the Dispatch job. See Def.'s Ex. H at 69-70 (Doc. No. 15-9). Before the transition became fully effective, Pre-Callers started fielding a small number of inbound calls from technicians, in addition to their outbound call duties. See Def.'s Ex. J at 118-19 (Doc. No. 15-11). Turcotte struggled with inbound calls. Id. at 116-18. Her poor performance led Comcast to retrain her for three weeks in the fall of 2012, which involved an experienced employee

sitting side-by-side with Turcotte throughout her shift. See Def.'s Ex. M (Doc. No. 15-14). Turcotte either observed the calls that the trainer fielded or had the trainer guide her through her own calls. See id.

Despite retraining, Turcotte's performance did not improve. When the transition to Dispatch was complete in mid-2013, Turcotte's supervisor, Bonnie Fournier, began receiving complaints about Turcotte from field technicians. See Def.'s Ex. N (Doc. No. 15-15). When Fournier sought to discuss some of those complaints as part of Turcotte's mid-year review in August 2013, Turcotte refused to meet with her. See id. Instead, Turcotte emailed an HR rep, indicating that she was frustrated at work and would consult her attorney. See Def.'s Ex. O (Doc. No. 15-16).

Within a few days of that incident, HR reps met with Turcotte on two occasions. See Def.'s Ex. P (Doc. No. 15-17). During each meeting, Turcotte said that she could no longer field inbound calls because of a medical condition. See id. She requested as an accommodation either a transfer to a new job or lower inbound call volume in her Dispatch position.

Comcast asked Turcotte to provide a medical certification to substantiate her claim and, in the interim, placed her in a temporary light-duty assignment performing "install intercepts," which involved making outbound calls to customers. See Def.'s

Ex. R (Doc. No. 15-19).  Turcotte requested that this be made into a permanent position for her.  Comcast refused and told her the assignment would end shortly due to a lack of work.  Id.

A few days later, on August 20, Comcast received a certification from Turcotte's healthcare provider, Nurse Tracey Bottazzi.  See Pl.'s Ex. 1, Attach. B-7 (Doc. No. 23-1).  When asked whether Turcotte had a physical or mental impairment and whether such an impairment substantially limited a major life activity, Bottazzi answered "No" to both questions.  See id. She also stated that Turcotte could do the essential functions of her job (fielding inbound calls) without any accommodation. See id.

In response, Comcast offered to reinstate Turcotte to her Dispatch position and to retrain her again, which she accepted. Fournier developed a four-week retraining program.  See Def.'s Ex. S (Doc. No. 15-20).  Turcotte says that her retraining was not successful and that she continued to experience anxiety and panic attacks during that period.  See Pl.'s Ex. 1 ¶ 18 (Doc. No. 21-2).  At one point, Fournier told her she should seek another job within the company.[1]  See id. ¶ 22.

---

[1]     Turcotte alleged in her complaint that Fournier harassed her during this period in violation of the ADA and New Hampshire Revised Statutes Section 354-A (Counts III and IV).  In response to Comcast's motion for summary judgment, Turcotte did not object to the dismissal of her harassment claims.  Accordingly, I do not summarize the facts relating to those claims.

In mid-September, toward the end of her retraining, Turcotte stopped working and informed Comcast that she had filed for short-term disability leave benefits. See Def.'s Ex. T (Doc. No. 15-21). She was approved for those benefits, as well as FMLA leave. Nurse Bottazzi's supporting paperwork, which was sent to Comcast's third-party disability leave administrator, Sedgwick, stated that Turcotte was "[u]nable to fully perform job functions" and noted that she was exhibiting increased blood pressure and pulse, tearfulness, and panic attacks. See Pl.'s Ex. 1, Attach. B-8 (Doc. No. 23-1). Bottazzi projected that Turcotte could return to work in three weeks. See id. About three weeks later, Bottazzi again furnished a similar form to Sedgwick and extended Turcotte's leave for three additional weeks. See Pl.'s Ex. 1, Attach. B-9 (Doc. No 23-1).

Unbeknownst to Comcast, the following month Bottazzi refused Turcotte's request to further extend her leave and dismissed Turcotte from her practice. See Def.'s Ex. V (Doc. No. 16-4). Bottazzi did so because she believed that Turcotte had dissembled and not followed her treatment plan.[2] See Def.'s Ex. A at 14-17 (Doc. No. 16-1).

---

[2] According to Bottazzi's treatment notes, Turcotte reported that her anxiety had not improved on medication, but the pharmacy informed Bottazzi's office that Turcotte never picked up the medication. See Def.'s Ex. V (Doc. No. 16-4). In addition, Turcotte told Bottazzi that she had scheduled a counseling appointment in November, but the counselor's office

In December 2013, while on leave, Turcotte applied for two vacancies at Comcast using the company's public website: Business Services Customer Care Virtual Business Class Billing Rep, Cycle 1 ("Virtual Rep") and Coordinator 2, Facilities ("Facilities Coordinator"). See Pl.'s Ex. 1, Attach. A (Doc. No. 21-3). She did not notify Comcast that she was seeking those jobs as an accommodation for her disability, and neither application led to a job offer. See id.

Comcast wrote a letter to Turcotte in January 2014, informing her that her right to FMLA leave had expired in December and that her short-term disability benefits had ended in January. See Def.'s Ex. W (Doc. No. 15-24). The letter explained that, if she needed an accommodation in order to return to work, a healthcare provider should complete an enclosed certification form on her behalf. See id.

On January 31, 2014, a new provider, Counselor Gretchen Grappone, supplied that certification. She stated that Turcotte suffered from social phobia and that this impairment substantially limited a major life activity. See Pl.'s Ex. 1, Attach. B-10 (Doc. No. 23-1). Because Turcotte had "anxiety around high volume of inbound calls," Grappone opined that she

_____

confirmed that was not the case. See id. In her deposition, Turcotte denied making the statements that Bottazzi found untruthful and stated that there were miscommunications between her and Bottazzi. See Pl.'s Ex. 2 at 281-85 (Doc. No. 23-2).

could not perform the essential functions of her Dispatch job. See id. A reasonable accommodation, according to Grappone, would be a "reduced inbound call requirement," at least until Turcotte gained confidence she could handle the work. See id.

In response, Comcast informed Turcotte in February that taking inbound calls was an essential function of her job and that the company was not able to reduce or control the number of inbound calls she would take. See Def.'s Ex. Y (Doc. No. 15-26). Comcast, however, offered to engage in an interactive process and place her on a 60-day internal job search to identify a vacant position to which she could be reassigned as an accommodation.[3] See id.

Comcast assigned Jim Lewis, an HR manager, to oversee and facilitate Turcotte's job search. See Def.'s Ex. F ¶ 13 (Doc. No. 15-7). Lewis tracked down open positions within her geographic area, compiled them into a bulleted list, and generally emailed the list to Turcotte twice a week. See id.; Pl.'s Ex. 1 ¶ 33 (Doc. No. 21-2). They had weekly telephone calls to discuss potential jobs. See Def.'s Ex. F ¶ 14 (Doc.

---

[3] Comcast acknowledged that Turcotte had "already effectively begun the job search process" through dialogue with HR, so her job search would "be much longer than 60 days." See Def.'s Ex. Y (Doc. No. 15-26). That dialogue began on February 3, when HR Rep Lisa Southworth called Turcotte regarding the job search, and they began exchanging emails concerning new vacancies. See Pl.'s Ex. 1, Attach. A-3 (Doc. No. 21-6).

No. 15-7); Pl.'s Ex. 1 ¶ 33 (Doc. No. 21-2). Turcotte believes that on some occasions Lewis did not send her every vacancy. See Pl.'s Ex. 1 ¶ 32 (Doc. No. 21-2). This is because, she explains, she found additional positions in her area that Comcast had advertised on external websites. See id.

On February 5, 2014, Turcotte told HR Rep Southworth that she had applied for the position of Coordinator 1, Technical Product Sales (BSS) ("BSS Coordinator") through an external website, CareerBuilder.com. See Pl.'s Ex. 1, Attach. A-3 (Doc. No. 21-6). Southworth told her not to apply through external websites because she would "show up as an external candidate, not a Comcast employee." See id. Instead, Turcotte should apply through Lewis so that he could work directly with the assigned recruiter. See id. Turcotte replied that she understood. See id. Although Southworth said she would contact the recruiter for the BSS Coordinator position, Turcotte never received a response.[4] See id.; Pl.'s Ex. 1, Attach. A (Doc. No. 21-3).

A week later, on February 12, Turcotte told Lewis she was interested in a vacancy for a Coordinator 2, Product Sales (MDU) ("MDU Coordinator") position. See Pl.'s Ex. 1, Attach. A-4 (Doc. No. 21-7). Lewis responded on February 22 that her

---

[4] The company says it has no record of her application. See Def.'s Ex. PP, Attach. 1 & 2 (Doc. No. 27-2).

medical restrictions precluded her from performing the essential functions of that job because she would have to field 63-72 inbound calls per day. See Def.'s Ex. II (Doc. No. 15-36); see also Def.'s Ex. PP ¶¶ 2-3 (Doc. No. 27-2). Turcotte rejected Lewis's assessment, insisted that she was qualified for the position, and asked for a certification form so that her healthcare provider could reassess her restrictions. See Def.'s Ex. PP ¶ 4 (Doc. No. 27-2). Lewis explained that if she could do the MDU Coordinator job, then she would likely be reinstated to her Dispatch position because this would mean she could in fact field a large volume of inbound calls. See id. ¶ 5.

Two days later, Turcotte applied for the position of Rep 2, Credit & Collections (Outbound) ("Collections Rep"). See Pl.'s Ex. 1, Attach. A-5 (Doc. No. 21-8). On March 14, Lewis told her that Comcast would consider her for this position, but she would need to sign a medical records release form to answer concerns about her work restrictions. See Pl.'s Ex. 1, Attach. A-6 (Doc. No. 21-9). When it sent her the release form, Comcast asked Turcotte to "include the contact information for the medical provider completing the Certification form on your behalf." See Def.'s Ex. KK (Doc. No. 15-38). The release form had space for the contact information of a single provider and options to limit the type of information disclosed, including by condition

and time period.  See id.  The information would be disclosed to
Comcast's clinical review officer.  See id.

   Turcotte refused to complete the release form because she
believed that Comcast had no valid reason to request it.  See
Pl.'s Ex. 1 ¶¶ 35-38 (Doc. No. 21-2).  She was also concerned
that the release would have allowed Comcast to obtain medical
records from all her healthcare providers and to speak to her
providers, effectively giving the company unfettered access to
her medical history.  See id. ¶ 35.

   It is unclear whether Turcotte told Comcast that she would
not complete the release form.  On March 21, however, Lewis
informed her that the Collections Rep position remained open,
but he reiterated that the company would need the release form.
See Def.'s Ex. LL (Doc. No. 15-39).

   That same day, Counselor Grappone reassessed Turcotte's
work restrictions at her request.[5]  See Pl.'s Ex. 1, Attach. B-11
(Doc. No. 23-1).  The certification states that Turcotte's
social phobia did not limit any major life activities, that the
condition was "well managed with medication [and] skill use,"

---

[5]    Turcotte requested this reassessment after Lewis informed
her in February that her existing work restrictions precluded
her from applying for the MDU Coordinator job.  See Pl.'s Ex. 1,
Attach. G (Doc. No. 21-25).  This certification is the most
recent medical evidence in the record.

and that she could perform the essential functions of her job without an accommodation.[6]  See id.

Grappone's assessment of Turcotte's ability to work is consistent with her treatment notes recording Turcotte's statements during three appointments in February and March. Turcotte had reported that she felt "able to handle phone calls in any new Comcast position," was "ready to return to work with no restrictions or need for accommodations," and was "ready and able to return to work."  See Def.'s Ex. DD (Doc. No. 16-7); Def.'s Ex. QQ (Doc. No. 27-3).  Grappone's notes also indicate that in March, Turcotte had asked her "not to provide any information by phone to any Comcast representatives under the advice of her attorney."  See Def.'s Ex. DD (Doc. No. 16-7).

Based on Grappone's March certification, Comcast offered to reinstate Turcotte to her Dispatch position effective April 8. See Def.'s Ex. BB (Doc. No. 15-29).  Turcotte refused, claiming that she was medically incapable of performing that job and that Grappone had been given an incorrect job description.  See Def.'s Ex. CC (Doc. No. 15-30); Def.'s Ex. MM (Doc. No. 15-40).

Comcast's next move was to extend Turcotte's job search for an additional 30 days, through May 21, 2014.  See Def.'s Ex. CC

---

[6]    It is disputed whether Grappone was referring to Turcotte's Dispatch job (fielding inbound calls) or her prior Pre-Caller position (fielding outbound calls).

(Doc. No. 15-30).  In April, she applied for three positions: NH

Facilities / Mailroom ("Mailroom") and two Intern/Co-op,

Administrative Services positions ("Intern 1" and "Intern 2").

Turcotte used Comcast's public website to apply for the Intern 1

position and did not notify Comcast that she was applying as an

accommodation candidate.  See Def.'s Ex. PP, Attach. 1 (Doc. No.

27-2).  Comcast eventually informed her via email that it

"decided to consider other candidates" for that position.  See

Pl.'s Ex. 1, Attach. A-12 (Doc. No. 21-15).  The other two

positions she pursued through the internal job search.  Comcast

determined that she was not qualified for the Mailroom position,[7]

but the company offered her the Intern 2 position.

The internship, which was paid but offered no benefits, was

scheduled to run from June until August 2014.  Lewis informed

Turcotte that if she accepted it, her internal job search would

end, and she would need to go through the normal bidding process

for future positions.  See Def.'s Ex. FF (Doc. No. 15-33);

Def.'s Ex. F ¶¶ 16-17 (Doc. No. 15-7).  Turcotte nonetheless

---

[7]     Lewis informed her that she was not qualified because she
lacked experience using hand tools, a ladder, and a pallet jack.
See Pl.'s Ex. 1, Attach. A-9 (Doc. No. 21-12).  At the motion
hearing, Turcotte's counsel conceded that Turcotte was not
qualified for this position and does not assert that Comcast's
failure to hire her violated the ADA.  See Jan. 23, 2019 Hearing
Tr. ("Tr.") at 98.

accepted, and Lewis hired her over other, potentially more
qualified, applicants. See Def.'s Ex. F ¶ 17 (Doc. No. 15-7).

During the internship and after her internal job search had
ended, Turcotte applied for two new vacancies at Comcast:
Administrative Assistant, Hudson, NH ("Admin Assistant 1") and
Assistant 2, Administrative Services, Customer Care ("Admin
Assistant 2"). See Pl.'s Ex. 1, Attach. A (Doc. No. 21-3). She
applied for those jobs via internal postings available to all
Comcast employees. See Def.'s Ex. PP, Attach. 2 (Doc. No. 27-
2). Although she had contact with the company's recruiters for
those positions, Turcotte did not notify them, or anyone else at
Comcast, that she was requesting those positions as an
accommodation for her disability. See Pl.'s Ex. 1, Attach. A-11
(Doc. No. 21-14); Pl.'s Ex. 1, Attach. A-13 (Doc. No. 21-16).
She was interviewed for the Admin Assistant 2 position but was
not offered either job. See Pl.'s Ex. 1, Attach. A (Doc. No.
21-3).

Turcotte separated from the company on August 29, 2014,
when her internship ended. See Pl.'s Ex. 1 ¶¶ 3, 41 (Doc. No.
21-2). That fall, she applied for two more jobs at Comcast:
Rep, Revenue Assurance ("Revenue Rep") and Rep 2, Credit &
Collections (Outbound) ("Collections Rep 2"). See id. ¶¶ 48-49.
Neither application succeeded.

Turcotte filed this suit in March 2017 in New Hampshire Superior Court, alleging that Comcast failed to accommodate her disability and created a hostile work environment in violation of the ADA and the state anti-discrimination statute. Comcast removed the action to federal court. In due course, Comcast moved for summary judgment on all claims. Turcotte objected with respect to her failure-to-accommodate claims but agreed to dismiss her hostile-work-environment claims.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (internal quotation marks omitted). A "genuine dispute" exists if a jury could resolve the disputed fact in the nonmovant's favor. Ellis v. Fidelity Mgmt. Trust Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016). Once the movant has properly carried that

burden, the burden shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in its favor." Flovac, 817 F.3d at 853 (internal quotation marks and brackets omitted).  If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted.  See id.  In considering the evidence presented by either party, all reasonable inferences are to be drawn in the nonmoving party's favor.  See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.  ANALYSIS

The ADA prohibits a covered employer from discriminating against a "qualified individual," defined as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. §§ 12111(8), 12112(a).  Failure to reasonably accommodate a qualified employee's known physical or mental impairment is a form of disability discrimination, unless such an accommodation would impose an undue hardship on the employer.  Audette v. Town of Plymouth, 858 F.3d 13, 20 (1st Cir. 2017).

Reasonable accommodation may include "reassignment to a vacant position."  42 U.S.C. § 12111(9)(B).  An employer is not

required to create a new job for a disabled employee or turn a temporary position into a permanent one.  See Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001); Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 697 (7th Cir. 1998). Rather, an employee must demonstrate that a vacant position existed and that she was qualified for it.  Audette, 858 F.3d at 20-21 & n.10; Phelps, 251 F.3d at 27.

To prevail on a failure-to-accommodate claim, an employee must establish that (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of either her existing position or another available job, with or without reasonable accommodation; and (3) the employer knew of her disability and did not reasonably accommodate it.[8]  See Audette, 858 F.3d at 20-21.

Turcotte does not contend that she could return to her Dispatch position with a reasonable accommodation.  Instead, she

---

[8]    With one limited exception, both parties assume that Turcotte's state-law claim for failure to accommodate, see N.H. Rev. Stat. Ann. § 354-A:7, is governed by the same legal standards as her ADA claim.  The exception is Comcast's argument, made for the first time in a supplemental brief filed after the motion hearing, that the definition of disability is more stringent under Section 354-A:7.  Given the lack of thorough briefing on the issue, I assume that federal and state law do not differ.  Cf. Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 457 (1st Cir. 2016) (assuming, without deciding, that elements of disability discrimination claim are same under New Hampshire statute and ADA).  In any event, the sole distinction argued by Comcast is not dispositive because I grant the summary judgment motion on other grounds.

argues that she requested as an accommodation a transfer to nearly a dozen other positions that she was qualified to perform and that Comcast unreasonably failed to reassign her to one of those positions.

Comcast responds by claiming that it is entitled to summary judgment for three distinct reasons. First, it contends that no reasonable jury could find that Turcotte was disabled and therefore entitled to an accommodation. Second, Comcast maintains that there is no evidence that Turcotte was qualified for some of the positions she sought. Third, says Comcast, Turcotte cannot show that it failed to reasonably accommodate her with respect to the remaining positions. I address each argument in turn.

**A. Whether Turcotte was disabled**

The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), having "a record of such an impairment," id. § 12102(1)(B), or "being regarded as having such an impairment," id. § 12102(1)(C). The first definition, referred to as the actual disability prong, is at issue here.[9]

---

[9]     Turcotte makes an undeveloped argument that the "regarded as" and "record of" prongs are also applicable here. That is plainly wrong. First, an employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." 29 C.F.R. § 1630.2(o)(4). Second, the "record of" prong

Comcast concedes that Turcotte has a triable claim that she suffered from social phobia, a mental impairment, and that this impairment can impact the major life activity of social interaction. The question then is whether Turcotte has presented enough evidence for a jury to find that social phobia "substantially limited" her social interaction.

EEOC regulations explain that the term "substantially limits" must be "construed broadly in favor of expansive coverage," "is not meant to be a demanding standard," and "should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." Id. § 1630.2(j)(1)(ii). Rather, the inquiry is whether a person is substantially limited in performing a major life activity "as compared to most people in the general population." Id.

Whether an impairment is substantially limiting must be judged "without regard to the ameliorative effects of mitigating measures" such as "medication, medical supplies, equipment . . .

_____

pertains to an employee who has a history of an actual disability and who is seeking "a reasonable accommodation if needed and related to the past disability." Id. § 1630.2(k)(3). For example, an employee may need leave or a schedule change because her past disability requires follow-up appointments with a healthcare provider. Id.

or learned behavioral . . . modifications." 42 U.S.C. § 12102(4)(E).[10]  In other words, an impairment must be evaluated in its unmitigated state.  See Summers v. Altarum Inst., Corp., 740 F.3d 325, 330 & n.3 (4th Cir. 2014); Gogos v. AMS Mech. Sys., Inc., 737 F.3d 1170, 1173 (7th Cir. 2013); Rohr v. Salt River Project Agric. Imp. & Power Dist., 555 F.3d 850, 861–62 (9th Cir. 2009).  For example, "diabetes will be assessed in terms of its limitations on major life activities when the diabetic does not take insulin injections or medicine and does not require behavioral adaptations such as a strict diet." Rohr, 555 F.3d at 862.

With these principles in mind, a reasonable jury could find that Turcotte's social phobia substantially limited a major life activity during the relevant period.  Counselor Grappone, Turcotte's healthcare provider, said so in her January 31, 2014 certification.  See Pl.'s Ex. 1, Attach. B-10 (Doc. No. 23-1). Specifically, she answered "Yes" to Question 1, which asked whether Turcotte had an impairment, and she explained that the

---

[10]    This provision was enacted as part of the ADA Amendments Act of 2008 ("ADAAA").  Congress expressly abrogated the Supreme Court's decision in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), which held that whether an impairment substantially limits a major life activity must be determined with reference to corrective measures.  See ADAAA, § 2(b)(2), Pub. L. No. 110-325, 122 Stat. 3553.  In Congress's view, Sutton improperly "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect."  Id. § 2(a)(4).

type of impairment was social phobia.  See id.  She also
answered "Yes" to Question 2, which asked whether the
"impairment as described in response to Question 1 substantially
limits any major life activities."  See id.  The certification
form included a list of major life activities.  See id.

Grappone's March 21, 2014 certification, the most recent
medical evidence in the record, creates ambiguity on this score.
There, she answered "No" to Question 2, which again asked
whether Turcotte's impairment was substantially limiting.  See
Pl.'s Ex. 1, Attach. B-11 (Doc. No. 23-1).  She also asserted,
however, that Turcotte's "social phobia [is] currently well
managed with medication [and] skill use" even though the
certification form instructed her "not [to] take into
consideration any ameliorative effects of mitigating measures,
such as medication."  Id.  Viewing the evidence in the light
most favorable to Turcotte, a reasonable jury could conclude
that Grappone evaluated Turcotte in a medicated state despite
the contrary instruction on the form.  Therefore, the jury could
disregard Grappone's answer to Question 2 in the March
certification and only credit her answer to the same question in
the January certification.

Comcast also points to Turcotte's own statements that she
could handle inbound calls and did not need an accommodation,
but that argument goes to the weight of the evidence, not its

20

sufficiency. To be sure, a jury would be amply justified in finding that Turcotte was not disabled. She told Grappone that she could handle phone calls in any new position and felt ready to return to work with no restriction or accommodation. See Def.'s Ex. DD (Doc. No. 16-7); Def.'s Ex. QQ (Doc. No. 27-3). She also told Comcast that she wanted the MDU Coordinator position even after Lewis explained that she would need to field a high volume of inbound calls, the same function that she allegedly could not perform in Dispatch. See Def.'s Ex. PP ¶¶ 2-4 (Doc. No. 27-2). But in light of the summary judgment standard and the easily satisfied test for determining whether an impairment substantially limits a major life activity, Turcotte has presented minimally sufficient evidence to give rise to a genuine dispute of material fact on this question.

**B. Whether Turcotte was qualified for a vacant position**

The second element of a failure-to-accommodate claim requires an employee to identify a vacant position and demonstrate that she was qualified for it. Audette, 858 F.3d at 20-21 & n.10; Phelps, 251 F.3d at 27. To show that she was qualified, the employee must satisfy a two-part test:

> [T]he plaintiff must demonstrate both that she satisfies the prerequisites for the position, that is, that she has the proper training, skills, and experience, and that she could perform the essential functions of [the] job, either with or without reasonable accommodation.

Soto-Ocasio v. Fed. Exp. Corp., 150 F.3d 14, 18 (1st Cir. 1998);
see 29 C.F.R. § 1630.2(m).

"An essential function is a fundamental job duty," as
opposed to "marginal tasks." Kvorjak v. Maine, 259 F.3d 48, 55
(1st Cir. 2001) (internal quotation marks omitted).  Evidence of
whether a function is essential includes, inter alia, "[t]he
employer's judgment as to which functions are essential,"
"[w]ritten job descriptions prepared before advertising or
interviewing applicants for the job," and "[t]he amount of time
spent on the job performing the function." 29 C.F.R.
§ 1630.2(n)(3).  Absent evidence of discriminatory animus,
courts "generally give substantial weight to the employer's view
of job requirements." Mulloy v. Acushnet Co., 460 F.3d 141, 147
(1st Cir. 2006) (internal quotation marks omitted).

Between December 2013 and August 2014, when her employment
ended, Turcotte applied for eight positions that she claims she
was qualified to perform.[11]  See Pl.'s Ex. 1, Attach. A (Doc. No.

_____

[11]     In her brief, Turcotte also argued that Comcast failed to
consider her for the position of Technical Logistic Controller
("TLC"), previously known as Field Traffic Controller ("FTC").
She asserted that Comcast converted Install Intercepts, a role
she performed briefly in August 2013, into permanent TLC/FTC
positions.  At the hearing, however, Turcotte's counsel conceded
that TLC/FTC was not the same job as Install Intercepts.  See
Tr. at 43-44.  The undisputed evidence is that the TLC position
was established in July 2018, several years after Turcotte left,
and that until 2016, its predecessor FTC required fielding a
large volume of incoming calls.  See Pl.'s Ex. 3 at 56-64 (Doc.
No. 21-27); Def.'s Ex. OO ¶ 4 (Doc. No. 27-1).  Because there is

21-3). There is no evidence in the record that she was qualified for six of those positions. Two of these positions entailed a high volume of inbound calls, an essential job function that Turcotte does not (and could not) argue she could perform. She has presented no evidence that she had the credentials required for the other four positions.

### 1. Positions requiring a high volume of inbound calls

Comcast has presented uncontroverted evidence that two positions Turcotte sought had the same essential job function that disabled Turcotte from working in Dispatch – fielding a high volume of incoming calls. The Virtual Rep position required fielding around 40 inbound calls per day. Def.'s Ex. PP ¶ 6 (Doc. No. 27-2). Comcast expected that Virtual Reps would take inbound calls all day. Id. Similarly, the MDU Coordinator position required fielding 63-72 inbound calls per day. Id. ¶¶ 2-3; Def.'s Ex. II (Doc. No. 15-36).

Turcotte's only response is that the job descriptions for those two positions did not mention a high inbound call volume. She has not presented a job description for the Virtual Rep position, however, so there is no evidence disputing Comcast's assessment. Further, the MDU Coordinator job description is

---

no dispute that Install Intercepts was a temporary light-duty assignment involving outbound calls and that Comcast did not have a permanent position whose sole function was to perform that assignment, Turcotte's claims regarding this position fail.

consistent with significant inbound calling and thus cannot create a genuine dispute of material fact.[12]  <u>See</u> Pl.'s Ex. 1, Attach. A-4 (Doc. No. 21-7).

Because there is no dispute that the Virtual Rep and MDU Coordinator positions entailed a large volume of inbound calls and that Turcotte could not perform this essential job function, her claims fail.  <u>See</u> Soto-Ocasio, 150 F.3d at 18.  More importantly, given that this was the very job function that Turcotte claims she could not perform in Dispatch, it defies logic to argue that those jobs would have been a reasonable accommodation.  If she could perform this function, Comcast would have no obligation to accommodate her at all.

### 2.  Failure to satisfy job prerequisites

Turcotte has failed to adduce any evidence that she had the skills, training, and experience required for four of her desired transfer positions: Facilities Coordinator, BSS Coordinator, Admin Assistant 1, and Admin Assistant 2.[13]

---

[12]  As with many other deficiencies in this case, Turcotte could have obtained evidence during discovery to substantiate her claims.  For example, her counsel could have deposed employees working in those positions concerning their work experience.  See 29 C.F.R. § 1630.2(n)(3) (listing "working experience of past incumbents in the job" and "current work experience of incumbents in similar jobs" as evidence of essential job functions).

[13]  Comcast also argues that Turcotte's claims regarding the Admin Assistant 1 and 2 positions cannot stand because she applied after she agreed to end her internal job search by accepting the Intern 2 job, and by that time, she had exceeded

The record contains no evidence as to the job requirements for either the BSS Coordinator or Admin Assistant 2 position. Turcotte has not produced a job description or other evidence of qualifications for those jobs. Nor are the requirements otherwise apparent from the job titles. It would therefore be impossible for a factfinder to conclude that Turcotte satisfied her burden to show that she was qualified for either post.[14] Cf. Lang, 813 F.3d at 456 (affirming summary judgment in favor of employer on employee's reassignment claim in part because plaintiff's affidavit failed to mention "specific circumstances" of desired job opportunities and "said nothing about the essential functions of the jobs in question").

Although the job descriptions for the Facilities Coordinator and Admin Assistant 1 positions are in the record, Turcotte has made no effort to show that she had the credentials for either job. The only evidence of her skills, training, and experience in the record is the job descriptions for the three jobs she held at Comcast (Customer Account Executive, Pre-

---

the amount of time that Comcast was reasonably required to engage in the interactive process. Because Turcotte has not shown that she was qualified for those positions, I do not address Comcast's alternative arguments.

[14] Turcotte's conclusory statements in her affidavit that she reviewed the job descriptions and was qualified for every position she sought are insufficient. See Mancini v. City of Providence, 909 F.3d 32, 44 (1st Cir. 2018) ("It is hornbook law that a plaintiff cannot avoid summary judgment by relying solely on conclusory allegations.").

Caller, and Dispatch).  Those job functions do not match the

requirements of either position she sought.  Compare Pl.'s Ex.

1, Attach. A-2 (Doc. No. 21-5) (Facilities Coordinator,

requiring "2-5 years related experience"), and Pl.'s Ex. 1,

Attach. A-11 (Doc. No. 21-14) (Admin Assistant 1, requiring "2-5

years related experience"), with Pl.'s Ex. 1, Attach. A-7 (Doc.

No. 21-10) (Dispatch), Pl.'s Ex. 1, Attach. G (Doc. No. 21-25)

(Pre-Caller), and Def.'s Ex. B (Doc. No. 15-3) (Customer Account

Executive).  Turcotte's claims thus fail because there is no

evidence from which a jury could find that she met the

prerequisites for those positions.

### C. Whether Comcast failed to reasonably accommodate Turcotte

The third element of an ADA claim is that an employer

unreasonably failed to accommodate an employee's known

disability.  Audette, 858 F.3d at 20.  Turcotte cannot satisfy

this requirement for eight positions because she (1) failed to

put Comcast on notice that she sought five of those positions as

an accommodation, (2) failed to cooperate in the interactive

process for one position, and (3) was not entitled to a

reassignment to two positions after her employment ended.

### 1. Failure to give notice of demand for accommodation

To trigger a duty to accommodate, an employer must be on

notice that an employee is seeking an accommodation.  Freadman

v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir.

2007); Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001). This means the employee "must explicitly request an accommodation, unless the employer otherwise knew one was needed." Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012). Special words, like reasonable accommodation, are not necessary, but the employee's request "must be sufficiently direct and specific, and it must explain how the accommodation is linked to [her] disability." Id. "This means not only notice of a condition, but of a causal connection between the major life activity that is limited and the accommodation sought." Id. (internal quotation marks omitted).

Turcotte has not mustered sufficient evidence to show that Comcast knew she was seeking an accommodation with respect to five positions: Virtual Rep, Facilities Coordinator, Intern 1, Admin Assistant 1, and Admin Assistant 2.[15]

She applied for the Virtual Rep and Facilities Coordinator positions as an external candidate in December 2013. There is no evidence in the record that Turcotte made a reasonably specific and direct request for an accommodation when she applied. Nor is there any evidence that Comcast otherwise knew she had applied as an accommodation. This was more than a month before Comcast received Counselor Grappone's January

---

[15]   As discussed above, her claims regarding each of those positions except Intern 1 also fail the qualifications prong.

certification that Turcotte needed an accommodation and promptly started her internal job search. The lone fact that Turcotte was on FMLA and short-term disability leave at the time is insufficient to show that Comcast was on notice that Turcotte sought an accommodation when she applied.[16]

Assuming Turcotte could assert a viable claim for the Intern 1 position, which is dubious,[17] there is likewise no evidence that Comcast knew this was a desired accommodation. Turcotte applied in mid-April as an external candidate, as opposed to applying through the internal job search. See Def.'s

---

[16] Turcotte's argument that Comcast was on notice because Fournier, her supervisor, told her to look for another job before she went on leave, is likewise without merit. Nothing in the record suggests that Fournier's statement was in recognition of Turcotte's need for an accommodation, as opposed to performance issues. Further, at the time, Nurse Bottazzi told Comcast that Turcotte was not disabled and did not need any accommodation.

[17] Turcotte does not dispute that Intern 1 was a temporary position comparable to the Intern 2 position that Comcast offered her in May 2014. See Def.'s Ex. PP ¶ 8 (Doc. No. 27-2). Her claim is that, as Intern 1, she would have returned to work from unpaid leave a month and a half sooner. See Tr. at 96. The viability of this claim is doubtful for three reasons. First, it is illogical for Turcotte to maintain that this position would have been a reasonable accommodation when she argues that the term-limited nature of the Intern 2 position rendered it an unreasonable accommodation. Second, there is no evidence in the record that Turcotte would have returned to work a month and a half sooner if given this position. Since she applied for the two internships within a two-week period, it is not a reasonable inference that the start dates would have been so divergent. Third, at least one circuit has held that the ADA does not require an employer to place a permanently disabled employee into a temporary position. See Thompson v. E.I. DuPont deNemours & Co., 70 F. App'x 332, 339 (6th Cir. 2003).

Ex. PP, Attach. 1 (Doc. No. 27-2).  She did so despite Comcast

informing her in February that she needed to apply internally

through Lewis to be considered for an accommodation position.

See Pl.'s Ex. 1, Attach. A-3 (Doc. No. 21-6).

Lastly, Turcotte applied for the Admin Assistant 1 and 2

positions after her internal job search had ended.  She applied

via Comcast's internal job postings available to all employees.

See Def.'s Ex. PP, Attach. 2 (Doc. No. 27-2); Pl.'s Ex. 1,

Attach. A-11 (Doc. No. 21-14).  As with the other three

positions, the record contains no evidence that Turcotte

indicated in her applications or otherwise told Comcast that she

was requesting either position as an accommodation.

Comcast is entitled to summary judgment on Turcotte's

claims concerning those five positions.  As Turcotte was well

aware, the company had a process available to employees seeking

accommodations.  Instead of utilizing that process, she

submitted the applications outside her internal job search,

without informing Comcast that those were accommodation

requests.  In fact, Turcotte ignored Comcast's specific

instruction to notify HR when she applied as an accommodation

candidate.  As a result, Comcast had no idea the applications

were accommodation requests.  Contrary to Turcotte's suggestion,

it is not a reasonable inference that a large company like

Comcast would intuit that her applications, submitted via

regular channels, doubled as requests for an accommodation. Turcotte's failure to alert Comcast that she was seeking those five positions as an accommodation is fatal to her claims.[18]

## 2. Failure to cooperative in the interactive process

Where an employer engages in an interactive process with an employee to discuss potential accommodations, both parties have a duty to participate in good faith. See E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014); Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008). In the event a breakdown occurs, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." Enica, 544 F.3d at 339 (quoting Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996)). An employee's failure to participate in good faith precludes liability under the ADA. Kohl's, 774 F.3d at 132.

An employee who refuses to comply with an employer's reasonable request for medical information pertaining to her

---

[18] Turcotte argues that Comcast unreasonably terminated the internal job search before she applied for the Admin Assistant 1 and 2 positions. To the extent she is arguing that Comcast's action excused her failure to request an accommodation with respect to those positions, I need not address her undeveloped argument. Her claims would still fail because she has proffered no evidence that she was qualified for either job.

disability can be found to have obstructed the process.  See
Beck, 75 F.3d at 1136 (affirming summary judgment for employer
where employee refused to sign medical records release form that
employer requested due to insufficient information about her
work restrictions); Templeton v. Neodata Servs., Inc., 162 F.3d
617, 618-19 (10th Cir. 1998) (affirming summary judgment for
employer because employee refused to authorize her physician to
release medical information that employer reasonably requested).
The employer's request must be "job-related and consistent with
business necessity." 42 U.S.C. § 12112(d)(4)(A).  EEOC
enforcement guidance provides that

> when the disability or the need for the accommodation
> is not known or obvious, it is job-related and
> consistent with business necessity for an employer to
> ask an employee for reasonable documentation about
> his/her disability and its functional limitations that
> require reasonable accommodation.

E.E.O.C., Enforcement Guidance: Disability-Related Inquiries and
Medical Examinations of Employees under the Americans with
Disabilities Act (2000), 2000 WL 33407181 at *9.  Ordinarily,
the employer cannot ask for an employee's complete medical
records.  Id. at *10.  But the employer is entitled to seek more
limited records sufficient to substantiate the claimed
disability and accommodation if the employee has presented
insufficient supporting documentation.  Id.  Documentation
provided by the employee may be insufficient where "other

factors indicate that the information provided is not credible or is fraudulent." Id. at *11.

Turcotte cannot maintain her claims regarding the Collections Rep position because she failed to participate in the interactive process in good faith with respect to that job. Comcast asked for a release of medical records, and Turcotte refused. Comcast's request was reasonable, job-related, and consistent with business necessity. The request came in March 2014, a few weeks after Turcotte provided flatly inconsistent information about the nature and extent of her disability. She told Comcast in February that she could do the MDU Coordinator job, despite being informed that the position involved fielding a high volume of inbound calls. See Def.'s Ex. PP ¶¶ 2-4 (Doc. No. 27-2); Def.'s Ex. II (Doc. No. 15-36). This was the same job function that she insisted she could not perform in Dispatch. Under those circumstances, there was sufficient indication that the information she had provided, including Counselor Grappone's January certification, was not credible. Thus, Comcast was within its rights to ask for a release of relevant medical records.

The scope of Comcast's request was also "no broader or more intrusive than necessary." See Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 98 (2d Cir. 2003). Contrary to Turcotte's assertion, Comcast did not seek her complete medical

records or unfettered access to her medical providers.  Rather, the release form had space for Turcotte to fill in the name and address of a single provider.  See Def.'s Ex. KK (Doc. No. 15-38).  Comcast told Turcotte that this should be "the medical provider completing the Certification form on your behalf" (that is, Counselor Grappone).  See id.  The release also had options for Turcotte to limit the information disclosed by type of condition and time period.  See id.  For example, she could have specified that the information Grappone could disclose must pertain to her social phobia from January 2014 (when Grappone filled out the first certification) onward.  Lastly, the information would be disclosed to Comcast's clinical review officer, further limiting the scope of the request.  Cf. Fraser v. Avaya Inc., No. 10-CV-00800-RPM, 2013 WL 4757263, at *2 (D. Colo. Sept. 4, 2013) (ADA "does not justify requiring the applicant to sign a medical authorization form that would authorize disclosure of confidential medical information to more persons than those necessarily involved in the evaluation of the application").

Turcotte's refusal to sign the release form that Comcast reasonably requested to answer questions concerning her work restrictions caused the breakdown in the interactive process. Accordingly, Comcast is entitled to summary judgment on

Turcotte's claims regarding the Collections Rep position for which the company declined to consider her as a result.[19]

### 3. Post-termination vacancies

After her employment with Comcast ended, Turcotte applied for the Revenue Rep and Collections Rep 2 positions.  Her claims regarding these positions fail because requests for accommodation that post-date a termination of employment cannot give rise to a duty to accommodate.  See, e.g., Severson v. Heartland Woodcraft, Inc., 872 F.3d 476, 482 (7th Cir. 2017), cert. denied, 138 S. Ct. 1441 (2018) (discarding claims regarding vacancies that became available after plaintiff's employment ended; noting that "it was [plaintiff's] burden to prove that there were, in fact, vacant positions available at the time of his termination"); Johnson v. Otter Tail Cty., No. 00-3098, 2001 WL 664217, at *1 (8th Cir. June 14, 2001) (per curiam) (employer "had no continuing duty to accommodate [plaintiff] by reassigning her to a vacant position [requested after] her employment . . . had terminated"); Wooten v. Farmland Foods, 58 F.3d 382, 386 (8th Cir. 1995) ("[Plaintiff's] evidence that he applied but was not chosen for a job that would have

---

[19]    Given Turcotte's failure to participate in the interactive process, Comcast would have been justified had it ended the internal job search and terminated Turcotte at that time.

accommodated his limitations is not material because the job became available only after he was terminated.").

## IV.  <u>CONCLUSION</u>

In summary, Turcotte has failed to show that she was qualified for the Virtual Rep, MDU Coordinator, BSS Coordinator, Facilities Coordinator, Admin Assistant 1, and Admin Assistant 2 positions.  Further, she cannot show that Comcast unreasonably failed to accommodate her disability with respect to the Virtual Rep, Facilities Coordinator, Intern 1, Admin Assistant 1, Admin Assistant 2, Collections Rep, Collections Rep 2, and Revenue Rep positions.  Lastly, she has conceded her claims regarding the Mailroom and Install Intercepts positions.  Accordingly, I grant Comcast's motion for summary judgment (Doc. No. 15) on all claims.  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.

/s/ Paul Barbadoro
Paul Barbadoro
United States District Judge

February 14, 2019

cc:   Leslie H. Johnson, Esq.
      Brian J. Bouchard, Esq.
      Christopher Cole, Esq.